**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

United States of America,

              Plaintiff,

v.

Liqing Liu, a/k/a Jeff Liu (1), and
Craig Joseph Kraft (2),

              Defendants.

**MEMORANDUM OPINION AND ORDER**
Crim. No. 08-15 ADM/FLN

---

Erika R. Mozangue, Esq., Assistant United States Attorney, Minneapolis, MN, on behalf of Plaintiff.

Caroline Durham, Esq., Office of the Federal Defender, Minneapolis, MN, on behalf of Liqing Liu.

Steve L. Bergeson, Esq., Tuttle Bergeson, P.A., Shakopee, MN, on behalf of Craig Joseph Kraft.

---

## I. INTRODUCTION

This matter is before the undersigned United States District Judge for consideration of the Government's Objection [Crim. No. 08-15(2) Docket No. 92] and Defendant Liqing Liu's ("Liu") Objections [Crim. No. 08-15(1) Docket No. 95] to Magistrate Judge Franklin L. Noel's April 7, 2008, Report and Recommendation ("R&R") [Crim. No. 08-15(1) Docket No. 85; Crim. No. 08-15(2) Docket No. 86]. Judge Noel recommends denial of Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Crim. No. 08-15(1) Docket No. 37], Liu's Motion to Suppress Statements, Admissions, and Answers [Crim. No. 08-15(1) Docket No. 38], and Defendant Craig Joseph Kraft's ("Kraft") Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Crim. No. 08-15(2) Docket No. 47]. Judge Noel recommends that this Court grant Kraft's Motion for Suppression of Admissions or Confessions [Crim. No. 08-

15(2) Docket No. 58]. For the reasons set forth below, Liu's Objections are overruled and the Goverment's Objection is sustained.

## II. BACKGROUND

On January 14, 2008, a grand jury returned an Indictment [Crim. Nos. 08-15(1) and 08-15(2) Docket No. 10] charging Liu and Kraft with conspiracy to transport women in interstate and foreign commerce for purposes of prostitution, in violation of 18 U.S.C. § 371 and § 2421. In particular, the Indictment states that from April 2007 to December 2007, Liu, with the assistance of Kraft, maintained brothels at two locations in Minneapolis, Minnesota, two locations in Bloomington, Minnesota, and one location in St. Louis Park, Minnesota. Indictment ¶¶ 3, 5. The Indictment alleges Liu received a percentage of each prostitute's earnings, and Liu and Kraft both booked airline tickets for prostitutes to travel to Minnesota from other states. Id. ¶¶ 7, 9.

At the March 5 and 7, 2008,[1] pre-trial motions hearing, Immigrations and Customs Enforcement Special Agent Jeremy Christenson ("Christenson") and Minneapolis Police Department Sergeants Matthew Wente ("Wente") and Grant Snyder ("Snyder") testified about their investigation of the prostitution ring. Judge Noel's thorough recitation of the facts is incorporated herein by reference. R&R at 2-16.

---

[1] The hearing began on March 5 and, after a continuance, concluded on March 7.

### III. DISCUSSION

A.  **Standard of Review**

"A district judge may refer to a magistrate judge for recommendation a defendant's motion to dismiss or quash an indictment or information, a motion to suppress evidence, or any matter that may dispose of a charge or defense." Fed. R. Crim. P. 59(b)(1). "The district judge must consider de novo any objection to the magistrate judge's recommendation." Fed. R. Crim. P. 59(b)(3).

B.  **The Government's Objection**

In support of his Motion for Suppression of Admissions of Confessions, Kraft argues that custodial statements elicited from him on December 13, 2007, should be suppressed because he did not knowingly and intelligently waive his Miranda rights and because his statements were involuntary. Judge Noel recommends that Kraft's Motion be granted because Kraft's will was overborne by threats and promises made by the law enforcement officers. The Government objects to this recommendation.

The Supreme Court in Miranda v. Arizona, 384 U.S. 436, 444 (1966), held that the Fifth Amendment privilege against compelled self-incrimination requires that law enforcement officers give warnings before interrogating a suspect held in custody. In particular, law enforcement officers must notify the suspect that: (1) he has the right to remain silent, (2) his statements may be used against him in a court of law, (3) he has the right to an attorney, and (4) if he cannot afford an attorney, one will be appointed for him. Id. A suspect's waiver of his Fifth Amendment privilege against self-incrimination is valid only if it is voluntarily, knowingly, and intelligently made. Id. The Government must show by a preponderance of the evidence that

a defendant's waiver meets these standards. Colorado v. Connelly, 479 U.S. 157, 168 (1986). A waiver is knowing if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." Moran v. Burbine, 475 U.S. 412, 421 (1986). A waiver is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." Id. "Two factors must be considered in the voluntariness inquiry: the conduct of the law enforcement officials and the capacity of the suspect to resist pressure to confess." United States v. Jorgensen, 871 F.2d 725, 729 (8th Cir. 1989).

At approximately 8:00 p.m. on the evening of December 13, 2007, Agent Christenson and Sergeants Wente and Snyder arrested Kraft at his workplace for state prostitution charges. Mar. 5, 2008, Hrg. Tr. [Crim. Nos. 08-15(1) and 08-15(2) Docket No. 74] at 15-16. During the drive to the Minneapolis police station, Agent Christenson observed that Kraft was "very eager to discuss what was going on" and he was "quite conversational." Id. at 32, 34. Agent Christenson told Kraft to "think about what you're being arrested for and the circumstances of that and we'll talk about it when we get to the police station." Id. at 32. Agent Christenson promised Kraft that he would not spend the night in jail if he cooperated with the law enforcement officers. Id. at 33. The law enforcement officers did not ask Kraft any questions during the drive. Id. at 32.

At the police station, the officers brought Kraft to a small, windowless interview room that was equipped with audio-visual recording equipment. Hrg. Ex. 7. After briefly leaving Kraft alone in handcuffs in the interview room, Sergeant Snyder entered the room and made a joke when he had difficulty with the lock on the door. Id. Kraft chuckled at Sergeant Snyder's

4

troubles with the lock.  Id.  Agent Christenson entered next.  Id.  Sergeant Snyder commented about Kraft's Sturgis biker ring.  Id.  Kraft casually talked about the mechanical difficulties he was having with his motorcycle.  Id.  Sergeant Wente arrived.  Id.  Agent Christenson and Sergeant Wente departed briefly to get the keys to remove Kraft's handcuffs.  Id.  While they were gone, Sergeant Snyder stated he was required to ask if Kraft had a knife or gun on his person.  Id.  Chuckling, Kraft answered no.  Id.  Sergeant Snyder joked that he brought his knife, and Kraft made a joke in response.  Id.  Agent Christenson and Sergeant Wente then removed Kraft's handcuffs.  Id.  Sergeant Wente asked Kraft if he had ever been in handcuffs.  Id.  Kraft responded that when his kids were younger he allowed his kids to place him in handcuffs and his kids had lost the keys.  Id.

Agent Christenson verified Kraft's full name and date of birth.  Id.  Sergeant Snyder obtained Kraft's cell phone and placed it on the table beyond Kraft's reach.  Id.  Agent Christenson reminded Kraft that the officers had given him "some stuff to ponder on the way over here."  Id.  Agent Christenson asked Kraft to tell the officers what Kraft thought the officers wanted to talk to him about.  Id.  Kraft alluded to a female who was supposed to be deported.  Id.  Sergeant Wente provided Agent Christenson with a pre-printed card containing the Miranda warnings.  Id.  Agent Christenson read the card and asked Kraft if he understood.  Id.  Kraft referred to money and stated that he did not have a lawyer.  Id.  Agent Christenson asked Kraft if he was willing to continue with the interview.  Id.  Kraft responded that he was willing to be interviewed.  Id.  Sergeant Snyder then asked Kraft if was willing to waive his right to an attorney and talk to the officers.  Id.  Kraft responded that he did not have an attorney.  Id.  Sergeant Snyder again asked Kraft if he was willing to waive his right to an attorney.  Id.  Kraft

5

responded that he would not know whom to call. Id. Sergeant Snyder asked if Kraft's response was a "yes." Id. Kraft responded, "yes, I mean I wouldn't know anybody. I've never had to use one." Id.

Agent Christenson named two women involved in the prostitution ring and asked Kraft if he knew of them. Id. Kraft answered affirmatively. Id. Agent Christenson asked Kraft if one of the women worked for the other. Id. Kraft responded that he was not aware that one of women worked for the other. Id. Agent Christenson then gave Kraft a "big guy-to-guy warning." Id. Agent Christenson stated the officers were not spring chickens. Id. Referring to the advice he gave Kraft on the ride to the police station, Agent Christenson said it was in Kraft's best interest to cooperate, especially because Kraft had a lot of things going for him in his life, such as his family. Id. Agent Christenson informed Kraft that the officers were there to talk to Kraft about his association with people who were doing bad things in the community. Id. Kraft stated he understood, and indicated he wanted to help the officers. Id. Agent Christenson stated the officers were "looking for big fish in the sea" and that Kraft was only a "guppy." Id. Sergeant Snyder told Kraft, "we're not really after you." Id. Kraft told the officers to ask him questions, and he would do his best to help them out. Id. Sergeant Snyder stated that the officers already knew a lot, and that if Kraft answered with half-truths, "this night is going to end badly for you." Id. For the next two hours, Kraft answered the officers' questions regarding his involvement with Liu. Id. At the conclusion of the interview, Kraft signed a Miranda waiver. Hrg. Ex. 6; Mar. 5, 2008, Hrg. Tr. at 17. The interview ended at approximately 10:16 p.m. Hrg. Ex. 6; Mar. 5, 2008, Hrg. Tr. at 38.

Based on these facts, Judge Noel concluded that Kraft's waiver of his Miranda rights was

involuntary because "Kraft was arrested in the evening at his work place.  He was promised by law enforcement that if he cooperated, then he would not spend the night in jail. . . . Defendant Kraft's waiver of his rights under *Miranda* cannot be considered voluntary as it was clear his liberty on that evening depended on his decision to waive his rights."  R&R at 30.

      After a de novo review of the record, this Court does not agree that Kraft's Miranda waiver was involuntary.  Again, "[t]he appropriate test for determining the voluntariness of a [waiver] is whether the [waiver] was extracted by threats, violence, or direct or implied promises, such that the defendant's will was overborne and his capacity for self-determination critically impaired."  United States v. Kilgore, 58 F.3d 350, 353 (8th Cir. 1995) (quotation omitted).  The circumstances of Kraft's Miranda waiver do not meet this "very demanding standard."  United States v. LeBrun, 363 F.3d 715, 727 (8th Cir. 2004).

      Kraft was arrested in the evening around 8:00 p.m.  Agent Christenson testified that during the drive to the Minneapolis police station, Kraft was eager to talk with the officers.  The video shows Kraft was calm as he told stories and engaged in casual conversation before the interview began. When Agent Christenson read the Miranda warnings, none of the officers repeated the promise that Kraft would not spend the night in jail if he cooperated.  There is no indication that Agent Christenson's earlier promise weighed heavily on Kraft's mind when he decided to waive his Miranda rights.  Kraft was fifty-eight years old on the date of the interview.[2]  There is no indication that he was under the influence of alcohol or drugs.  Although there is no evidence in the record of Kraft's education level, it appears Kraft possesses at least

---

[2] Although the Government states Kraft was forty-nine years old, Kraft states on the video that he was born in 1949.

average intelligence.  His handcuffs were removed before the officers questioned him.  Based on the totality of the circumstances, particularly Kraft's eagerness to talk with the officers as shown in the video, this Court finds that Agent Christenson's earlier promise did not overbear Kraft's will such that his capacity for self-determination was critically impaired when he waived his Miranda rights.

Judge Noel also concluded that Kraft's subsequent statements were involuntary.  Judge Noel relied on the following facts: (1) Agent Christenson promised Kraft during the drive to the police station that Kraft would not spend the night in jail if he cooperated; (2) Agent Christenson referred to Kraft's family, implying Kraft had a lot to lose if he did not cooperate; and (3) Sergeant Snyder told Kraft the night would end badly for him if he told half-truths.  Based on a de novo review of the record, however, this Court cannot agree that the officers' conduct was so coercive as to critically impair Kraft's capacity for self-determination.  Again, Kraft was fifty-eight years old in December 2007, and he appears to possess at least average intelligence.  Kraft was eager to talk during the car ride and at the police station.  Kraft did not appear to be in distress.  To the contrary, he joked with the officers and relayed anecdotes when the interview began.  Kraft readily answered when Agent Christenson asked him what he thought the subject of the interview would be.  When Agent Christenson read Kraft his Miranda rights, Kraft stated he understood, and waived his right to have a lawyer present.  Although Agent Christenson briefly referred to Kraft's family, he did not make any promises regarding them or threaten to take adverse action against them.  Finally, even when considered in light of the earlier promise that Kraft could go home that night if he cooperated, there is no indication that Kraft's will was overborne by Sergeant Snyder's statement that the night would end badly if Kraft told half-

truths. The officers certainly applied psychological pressure on Kraft. Under the totality of the circumstances, however, the pressure was not so coercive as to overbear Kraft's will. See United States v. Astello, 241 F.3d 967, 968 (8th Cir. 2001) (holding that tactics such as psychological pressure, making false promises, playing on a suspect's emotions, and using his family against him did not render a confession involuntary).

"Police interrogation tactics are designed to elicit a response, and the fact that the tactics produced the intended result here does not make [Kraft's] confession involuntary." Id. Moreover, Kraft was "very eager to discuss what was going on" and he was "quite conversational" shortly after he was arrested. Mar. 5, 2008, Hrg. Tr. at 32, 34. Assuming arguendo that the agents used improper tactics to pressure Kraft, the record reflects that such tactics did not overbear Kraft's will because he was already inclined to answer the officers' questions.

Additionally, this Court rejects Kraft's argument that he asserted his right to counsel. Kraft's statements that he did not know whom to call were not a clear and unequivocal invocation of Kraft's right to have counsel present during the interview. Davis v. United States, 512 U.S. 452, (1994) ("[W]hen a suspect makes an ambiguous or equivocal statement, it will often be good police practice for the interviewing officers to clarify whether or not he actually wants an attorney. . . . But we decline to adopt a rule requiring officers to ask clarifying questions."). United States v. Kelly, 329 F.3d 624, 630 (8th Cir. 2003) (stating that "only a clear and unequivocal request for the assistance of counsel may serve to invoke a defendant's right"). Instead, Kraft explicitly stated that he understood and was waiving his right to counsel. Hrg. Ex. 7. The Government's Objection to the R&R is sustained, and Kraft's Motion for Suppression of

Admissions or Confessions is denied.

**C.     Liu's Objections**

    **1.     Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure**

        **a.     Validity of Search Warrants**

Liu objects to Judge Noel's recommendation that Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure be denied. Liu argues that three search warrants issued in December 2007 were not supported by probable cause, and therefore the subsequent searches violated the Fourth Amendment. The search warrants were to search an apartment on Arona Street in St. Paul, Minnesota; an apartment on Park Commons Drive in St. Louis Park, Minnesota; and a 2004 Kia Sorrento. Hrg. Exs. 1-3. "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." United States v. Fladten, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). Agent Christenson's supporting affidavit describes the investigation of prostitution activities at the Arona Street and Park Commons Drive apartments, and evidence that the Kia Sorrento was used to transport prostitutes. Id. After reviewing the record, this Court agrees with Judge Noel's analysis and conclusion that all three search warrants were supported by probable cause. See R&R at 17-18.

Liu also argues that the three search warrants were invalid because Agent Christenson's affidavit in support of probable cause "contain[ed] false or omitted statements made knowingly and intentionally or with reckless disregard for the truth." United States v. Reinholz, 245 F.3d 765, 774 (8th Cir. 2001) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)). Liu cites seven

alleged instances of false statements or omissions. Objections at 3-5. Judge Noel concluded that Liu has failed to demonstrate that Agent Christenson's affidavit contains a false statement or an omission that was made deliberately or with reckless disregard for the truth. See R&R at 20-22. This Court agrees. Accordingly, Liu's objections regarding the validity of the three search warrants are overruled.

### b. Validity of the October 23, 2007, Seizure

Liu next argues that certain evidence should be suppressed as the fruits of an unreasonable search and seizure. At the pre-trial motions hearing, Sergeant Wente testified to the following facts. On October 23, 2007, Sergeant Wente entered the Park Commons Drive apartment under the guise of being a customer to a massage parlor. Mar. 5, 2007, Hrg. Tr. at 68. Wente was taken to a bedroom. Id. A masseuse gave Wente, who was naked, a massage and then produced a condom. Id. at 70. Wente told the masseuse he only wanted to give her a massage. Id. Wente asked the masseuse if she had any lotion for the massage. Id. The masseuse opened a closet door and motioned for Wente to assist her in searching for lotion inside her suitcase, which was in the closet. Id. at 70-71. After failing to find any lotion, Wente proceeded to give the masseuse, who was also naked, a massage. Id. at 71. Afterwards, the masseuse assisted Wente with putting his clothes on. Id. at 72. As he was getting dressed, Wente noticed an airline luggage tag on the handle of the suitcase. Id. Wente believed the luggage tag might assist in his investigation of the prostitution ring. Id. Pretending to be faint, Wente asked the masseuse to bring him a wet washcloth from the bathroom. Id. While the masseuse was in the bathroom, Wente removed the luggage tag from the suitcase, and took it with him when he left the Park Commons Drive apartment. Id. at 72-73. Based in part on

information obtained from the luggage tag, officers arrested the masseuse at the Minneapolis airport on November 5, 2007. Id. at 76-77.

Judge Noel determined that Sergeant Wente's seizure of the luggage tag was lawful under the plain view doctrine. R&R at 24-26; see United States v. Bustos-Torres, 396 F.3d 935, 944 (8th Cir. 2005) (noting that "an officer, without a warrant, may seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating character is immediately apparent, and the officer has a lawful right to access the object"). This Court endorses Judge Noel's analysis. Liu's objection regarding Sergeant Wente's seizure of the luggage tag is overruled.

### c. Warrantless Search of a Curbside Trash Can

On October 1, 2007, Sergeant Snyder searched two trash cans on the curb of a residence on Morgan Avenue, Minneapolis, that Liu allegedly used as a brothel. Mar. 7, 2008, Hrg. Tr. [Crim. No. 08-15(1) Docket No. 82] at 6-9, 12-13. Sergeant Snyder found a rental agreement for another property that Liu had signed. Id. at 9. Judge Noel correctly concluded that Sergeant Snyder's search of the trash cans was permissible under the Supreme Court's decision in California v. Greenwood, 486 U.S. 35, 39 (1988) (concluding that individuals do not have a reasonable expectation of privacy in garbage left on the curb for collection). Therefore, Liu's objection regarding the search of the trash can is overruled.

### 2. Liu's Motion to Suppress Statements, Admissions, and Answers

Judge Noel rejected Liu's arguments that statements he made to Agent Christenson on December 13, 2007, should be suppressed because of Miranda violations and because Liu's statements were involuntarily made. Agent Christenson testified that Liu was advised of his

rights in Mandarin Chinese by Special Agent Donny Cheung, and Liu indicated he understood his rights both verbally and in writing. Mar. 5, 2008, Hrg. Tr. at 8-9; Hrg. Ex. 4. Liu's conversation with Agent Christenson occurred after Liu waived his rights. Id. at 9. Agent Christenson immediately ended the interview when Liu requested a lawyer. Id. at 10-11. Liu's argument that the law enforcement officers violated Miranda is without support. Similarly, for the reasons stated in the R&R, the Court finds that Agent Christenson's statement that Liu and his family members could be deported if they were involved in criminal activity did not coerce Liu into making a statement. R&R at 28; Mar. 5, 2008, Hrg. Tr. at 23-25.

Finally, this Court rejects Liu's invitation that this Court should hold that the Federal Constitution requires that law enforcement agencies record custodial interrogations. This Court has long felt that recording custodial interviews is the better practice. The practice of recording such interviews does not seem to inhibit many defendants from talking to officers and the evidence preserved on tape can then be helpful to the Court's analysis of the totality of the circumstances as in Kraft's situation in this case. Many state courts, including the Minnesota Supreme Court, require the recording of custodial interrogations under their respective state constitutions. Minnesota v. Scales, 518 N.W.2d 587, 588 (Minn. 1994). However, the Supreme Court has not held that such recording is required, and the Eighth Circuit has rejected the argument. United States v. Williams, 429 F.3d 767, 772 (8th Cir. 2005) (declining to establish a rule that police use tape-recording equipment in formal interrogation settings). Therefore, the law enforcement officers did not violate Liu's Federal Constitutional rights by failing to record his statements. This Court overrules Liu's objections to the denial of his Motion to Suppress Statements, Admissions, and Answers.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. Magistrate Judge Franklin L. Noel's April 7, 2008, Report & Recommendation ("R&R") [Crim. No. 08-15(1) Docket No. 85; Crim. No. 08-15(2) Docket No. 86] is **ADOPTED IN PART**;

2. The Government's Objection [Crim. No. 08-15(2) Docket No. 92] to the R&R is **SUSTAINED**;

3. Defendant Craig Joseph Kraft's ("Kraft") Motion for Suppression of Admissions or Confessions [Crim. No. 08-15(2) Docket No. 58] is **DENIED**;

4. Kraft's Motion for Suppression of Evidence Obtained as a Result of Search and Seizure [Crim. No. 08-15(2) Docket No. 47] is **DENIED**;

5. Defendant Liqing Liu's ("Liu") Objections [Crim. No. 08-15(1) Docket No. 95] to the R&R are **OVERRULED**;

6. Liu's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Crim. No. 08-15(1) Docket No. 37] is **DENIED**; and

7. Liu's Motion to Suppress Statements, Admissions, and Answers [Crim. No. 08-15(1) Docket No. 38] is **DENIED**.

BY THE COURT:


    s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated: May 5, 2008.